IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PENNINGTON PARTNERS, LLC  \*
et al.                    \*
                          \*
v.                        \*   Civil Action No. WMN-09-2057
                          \*
MIDWEST STEEL HOLDING CO.,\*
INC.                      \*
                          \*
\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM**

Before the Court is Defendant's Motion for Summary Judgment, ECF No. 43. The motion is fully briefed. Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion should be granted in part and denied in part.

**I. FACTUAL BACKGROUND**

This action arises out of the partial collapse of a dry storage building (the Building) while employees of Defendant Midwest Steel Holding Co., Inc. (Midwest) were engaged in the process of demolishing several decommissioned brick lined steel storage tanks that were adjacent to and connected to the Building. The Building was owned by Plaintiff Pennington Partners, LLC (Pennington). Plaintiff Mid States Oil Refining, LLC (Mid States) is an oil refining business that was considering locating part of its oil recycling operations in the

Building.  Defendant Midwest is a large national demolition company based in Houston, Texas.

Pennington and Mid States bring claims against Defendant for breach of contract (Count I) and Negligence (Count II).  At issue in the present motion is whether Plaintiffs' own negligence contributed to the Building's partial collapse or whether Plaintiffs assumed the risk of that collapse by failing to make some recommended repairs to the Building or by permitting Midwest to continue its demolition operations when Plaintiffs should have known the Building was being put at risk.  Pointing to the same facts, Defendant argues that Plaintiffs cannot establish that Defendant's alleged breach of contract was the proximate cause of the damage to the Building.  Finally, Defendant contends that Pennington's breach of contract claim must be dismissed because Defendant entered into a contract with Mid States, not Pennington, and there is no evidence that Pennington was the intended third party beneficiary of that contract.  The facts relevant to these defenses, viewed in the light most favorable to Plaintiffs, are as follows.

Alan Bock, the president of Plaintiff Mid States contacted Defendant Midwest sometime in December 2007 to inquire about demolishing several storage tanks that were located on the east and west sides of the Building.  The goal of the demolition was to create better railroad access to the Building.  Bock spoke

with Ed Rayner, a Midwest superintendent, and on or about December 13, 2007, the two met on the site to discuss the job. Bock explained that, while he wanted the tanks removed, the Building was staying and would be refurbished. He also explained that he would like Midwest to start on the tanks on the east side of the Building to facilitate the planned railroad project.

On December 14, 2007, Midwest submitted a written proposal to Bock for "an all-inclusive rate for supervision, manpower, equipment and insurance to dismantle" the tanks. Compl., Ex. 1. The proposal was accepted by the return of a purchase order that same day. Demolition started the next day, December 15, 2007.

Bock was not on site when demolition began. Shortly thereafter, however, he received a telephone call that, contrary to his request, Midwest had started on the west side of the building. Bock asked that Midwest move to the east side of the Building and they did so.

Bock later arrived at the scene and watched the demolition. Within a short time, he was joined by a friend, John Riston, who is an industrial contractor and who also has some experience in demolition work. At one point Bock had considered hiring Riston to take down the tanks. Bock and Riston observed Midwest employee David Ramirez operating a track excavator equipped with a shear device (claw). Ramirez had placed a metal piercing

3

point in the shear device, and was using the piercing point to open holes in the tanks. Ramirez successfully took down the southern-most tank on the eastern side of the Building and was working on the second southern-most tank when the Building collapse occurred.

Immediately before the collapse, Bock and Riston had a conversation about the technique Ramirez was using to take down the tanks. Riston recounts in his deposition that after seeing Ramirez back over a guardrail and almost roll the machine back down over a hill he remarked to Bock that "these guys are basically unsafe." Riston Dep. 35. Riston yelled to Ramirez that he was "going to destroy the machine the way [he was] beating on it like that." Id. Ramirez idled down the machine, opened the cab door, and responded to Riston that "[t]his is what we do all the time. We know what we are doing." Id. Before idling the machine up, Ramirez asked Bock, "[d]o you want to save this Building?" to which Bock answered, "Yes. I want to save the building. Don't hurt the building." Id. Riston also stated in his deposition that he had concerns that the tank might fall into the building. Id. 19, 65. There is nothing in the record, however, to indicate that Riston shared this concern with Bock.

In their depositions, Bock and Ramirez relate similar accounts of the exchange that occurred between them shortly

4

before the collapse. The only major difference is that Ramirez testified that he told Bock that he observed the tin on the Building vibrate and that this observation was what caused him to ask Bock if he wanted the Building saved. Ramirez Dep. 133. Bock denies that Ramirez mentioned anything about the tin vibrating. Significantly, Ramirez also testified that, at the time he made this comment, he did not himself have any concerns about the safety of the building if he were to continue with the same method of demolishing the tanks. Id. 134. Ramirez also testified that until this exchange, he had not been told that the Building was to be saved. Id. 92-93.

Immediately after this exchange, the east wall of the building collapsed. Plaintiff's cause and origin expert, Skip Harclerode, opined it was Defendant's failure to separate the tanks from the Building, prior to demolition, that caused the collapse. Harclerode Dep. 94-95. The damage caused by the collapse was sufficiently extensive that Plaintiffs determined it was more efficient to demolish the remainder of the Building and replace it, rather than attempting to repair the damage.

Defendant makes much of the fact that Harclerode had inspected the Building approximately a year and one half prior to the December 15, 2007, collapse and had determined that this same portion of the east wall was in need of major repair. Harclerode related to Bock that the foundations and bottom

portions of 10 to 12 columns in that portion of the wall needed to be repaired or replaced.  Despite Harclerode's recommendations, Plaintiff had not performed any of these suggested repairs when Defendant began the tank demolition.

**II. LEGAL STANDARD**

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In Anderson v. Liberty Lobby, Inc., the Supreme Court of the United States explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  Id. at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," Matsushita Elec.

6

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also E.E.O.C. v. Navy Federal Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). The opponent, however, must bring forth evidence upon which a reasonable fact finder could rely. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact." Pension Benefit Guar. Corp. v. Beverley, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing Pine Ridge Coal Co. v. Local 8377, UMW, 187 F.3d 415, 422 (4th Cir. 1999)). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. Anderson, 477 U.S. at 252.

## III. DISCUSSION

Defendant argues that Plaintiffs' negligence claim is barred on the grounds of contributory negligence and assumption of risk. Contributory negligence "occurs whenever the injured person acts or fails to act in a manner consistent with the knowledge or appreciation, actual or implied, of the danger or injury that his or her conduct involves." Campbell v. Montgomery County Bd. of Educ., 533 A.2d 9, 14 (Md. Ct. Spec. App. 1987). Under Maryland law, contributory negligence is a

complete bar to any recovery. <u>Warsham v. James Muscatello, Inc.</u>, 985 A.2d 156, 167 n.10 (Md. Ct. Spec. App. 2009). The defendant has the burden of proving contributory negligence. <u>Myers v. Bright</u>, 609 A.2d 1182, 1186 (Md. 1992).

Furthermore, it is well established in Maryland that contributory negligence is ordinarily a question for the jury.

> The familiar rule to be applied in determining whether the facts justify a holding that the plaintiff was guilty of contributory negligence as a matter of law is that the act (or omission) so relied on must be distinct, prominent and decisive, and one about which reasonable minds would not differ in declaring it to be negligence. If more than one inference can be drawn from facts in respect of the issue of contributory negligence, it must be submitted to the jury. There may also be a jury question, even where negligence seems fairly clear, when the facts permit a finding that the injured party's conduct had its basis in a reasonable expectation.

<u>Kasten Const. Co. v. Evans</u>, 273 A.2d 90, 93 (Md. 1971) (internal quotations omitted).

The elements of a defense of assumption of risk are similar. To establish this defense, "the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." <u>ADM P'ship v. Martin</u>, 702 A.2d 730, 7324 (Md. 1997). When proven, assumption of the risk is also a complete bar to recovery "because it serves as a previous abandonment of the right to complain if an accident occurs." <u>Saponari v. CSX Transp., Inc.</u>, 727 A.2d 396, 444 (Md. Ct. Spec. App. 1999). As

in the case of contributory negligence, the issue of whether the plaintiff has assumed the risk is generally a question for the jury. Only "when the undisputed facts permit only one reasonable conclusion" can summary judgment be granted to a defendant on assumption of risk. Chalmers v. Willis, 231 A.2d 70, 73 (Md. 1967).

Defendant uses essentially the same facts and argument to support its contributory negligence and assumption of risk defenses. In support of its contributory negligence theory, Defendant posits, "Mr. Bock's failure to halt the demolition before the partial building collapse after the demolition appeared to become unsafe constitutes contributory negligence as a matter of law." Mot. at 8. To advance its assumption of risk theory, Defendant suggests "Plaintiffs assumed the risk of the partial building collapse because before the collapse occurred Alan Bock had knowledge of and appreciated the risk of danger from the demolition, and he voluntarily confronted that danger by not telling Mr. Ramirez to stop the demolition." Id. at 10. Thus, the crux of Defendant's position is that Ramirez's question, "do you want to save this Building?," when coupled with Riston's observation that "these guys are basically unsafe" and Harclerode's previous assessment of the structural weakness of that portion of the building, should have alerted Bock to the imminent danger and, at that point, he should have ordered

Ramirez to stop the demolition. Not doing so was, in Defendant's view, the "prominent and decisive act" that directly contributed to the Building's collapse. Id. at 9.[1]

The Court would agree that a jury could find for Defendant on these facts based on inferences that could be drawn in Defendant's favor. This case, however, is before the Court on a summary judgment motion where inferences must be drawn in favor of the non-moving party. Under that standard, Defendant's arguments must be rejected.

Defendant would have the Court infer from Bock hearing Ramirez's question that Bock should have known that continuing with the demolition was unsafe. Given that Ramirez testified that he was not himself concerned for the safety of the building when he asked Bock the question, Ramirez Dep. at 134, the Court need not infer that Bock should have read into the question an opinion that Ramirez himself did not hold. Similarly, Defendant would have the Court infer from Riston's comment that Defendant's crew was "unsafe" that Riston was telling Bock that the crew was a danger to the Building. An equally plausible inference from that comment, however, is that Riston believed

---

[1] Defendant points to the fact that Bock was able to direct Defendant's crew to move from the west side to the east side of the Building to establish that Bock could have stopped the demolition at any time. The Court assumes for the purpose of this motion that Bock, as the representative of the entity that contracted with Defendant to remove the tanks, could have stopped the demolition if he so chose.

that Ramirez was going to bring harm to himself or damage the machine by the way he was using the machine.

The Court also notes that at the time that Defendant argues Bock should have realized the Building was in danger, Defendant's agent was assuring Bock and Riston that there was nothing to worry about because "[t]his is what we do all the time. We know what we're doing." Riston Dep. 35. Bock's knowledge that Defendant was in the business of doing large demolition projects makes it reasonable for him to accept Ramirez's reassurances.

The Court finds that Defendant is not entitled to summary judgment on Plaintiffs' negligence claim.

Defendant's motion for summary judgment on the contract claim fails for similar reasons. Defendant argues that, assuming arguendo that there was a breach of contract, Defendant is still entitled to judgment because "Bock's intervening act of failing to stop the demolition after Mr. Ramirez asked him about saving the building broke the causal link between any purported breach by Defendant and the partial building collapse." Mot. at 12. Thus, in Defendant's view, Defendant's alleged breach was not the "proximate cause" of the collapse. Id.

While concepts of intervening cause and proximate cause are more typically raised in the context of tort claims, it is nonetheless true that, to recover damages for losses under a

breach of contract theory, the plaintiff must prove that those losses were proximately caused by the breach. Hoang v. Hewitt Ave. Assoc., LLC, 936 A.2d 915, 934 (Md. Ct. Spec. App. 2007). "Proximate cause" in this context means losses that actually resulted from the breach. Id. Plaintiff has pointed to some authority for other jurisdictions holding that, when losses are the result of an intervening cause, damages for those losses are not allowed. Reply at 16 (quoting Nat'l Market Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520 (2nd Cir. 2004)).

Nevertheless, Defendant's intervening cause argument relies on the same inferences as its contributory negligence and assumption of risk arguments. Bock's failure to stop the demolition was only an "intervening cause" if he had reason to believe that the continued demolition posed a threat to the Building. For the reasons stated above, the facts viewed and inferences drawn in the light most favorable to Plaintiffs do not support that conclusion.

Finally, the Court addresses Defendant's argument that Pennington was not an intended beneficiary of the demolition contract. Defendant correctly observes that the proposal was sent to Bock as President of Mid States and nothing in the proposal references Pennington. Compl., Ex. 1. The purchase order accepting the proposal indicated it was sent by yet another entity, "Atlantic Ethanol." Plaintiffs make no argument

12

that Pennington was a direct party to the contract or was mentioned anywhere in the documents forming the contract.

Instead, Plaintiffs argue that Pennington was an intended third party beneficiary to the contract. Under Maryland law, before bringing a claim under a contract as a third-party beneficiary, a person "must first demonstrate 'that the contract was intended for his benefit; and, in order for a third party beneficiary to recover for a breach of contract[,] it must clearly appear that the parties intended to recognize him as the primary party in interest and as privy to the promise . . . .'" Century Nat'l Bank v. Makkar, 751 A.2d 1 (Md. Ct. Spec. App. 2000) (quoting Marlboro Shirt Co. v. Am. Dist. Tel. Co., 77 A.2d 776, 777 (Md. 1951)). If it is not clear that the contract is intended for the benefit of that person, then the person is merely an incidental beneficiary and cannot recover for breach of contract. See id. ("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. In order to recover it is essential that the beneficiary shall be the real promisee; i.e. that the promise shall be made to him in fact, though not in form.") (internal quotations omitted).

As evidence that Plaintiffs believe gives rise to an inference that Pennington was an intended third party beneficiary, Plaintiffs proffer Bock's affidavit in which he

13

states that, when he introduced himself to Rayner, he advised Rayner that he was "affiliated with Pennington Partners, the owner of the site and the Building, and Mid States Oil." Bock Aff. ¶ 4. Plaintiffs also note that Christopher Givens, the individual at Midwest that actually sent the proposal to Bock, testified in his deposition that he understood Bock to be the "owner's representative." Givens Dep. at 81. Givens further testified that he was given the information that Bock was the owner's representative from Rayner and another Midwest employee, Kevin Murphy. Id. Defendant counters with the affidavit of Tammy Horton, Defendant's Vice President, in which she declares that "[n]o one at Midwest had ever heard of nor had any knowledge of Pennington Partners, LLC during [the period December 13, 2007, to December 15, 2007]." Horton Aff. ¶ 2. Defendant also cites Givens' deposition where he explains that he understood that he was sending out the proposal to Mid States.[2]

From this evidence, the most favorable inference that the Court could draw in Plaintiffs' favor is that Defendant intended to enter a contract with the owner of the Building but was under the mistaken belief that Mid States was that owner. That

---

[2] As Bock was a representative of Mid States as well as Pennington, this understanding is consistent with his testimony elsewhere that he understood he was dealing with the "owner's representative."

inference, however, does not give rise to a third party beneficiary claim.  If this is what occurred (which is the most likely scenario), Defendant did not enter into a contract with one party intending to benefit another; it simply misidentified the owner.  Thus, the Court finds that Defendant is entitled to judgment on Pennington's breach of contract claim, which is premised solely on a third party beneficiary theory.  See Compl. ¶ 13.

**IV. CONCLUSION**

For these reasons, Defendants motion will be granted as to Pennington's breach of contract claim.  The motion will otherwise be denied.  A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: December 16, 2010.